■ In the Matter of the CITY OF NEW YORK, Respondent-Appellant, Relative to Acquiring Title of Real Property for Park and Street Purposes Located

Between Rockaway Point Boulevard and Other Streets in the Borough of Queens. In the Matter of the CITY OF NEW YORK, Respondent-Appellant, Relative to Acquiring Title to Real Property for Park and Street Purposes Located Between Beach 222nd Street and Other Streets in the Borough of Queens. ATLANTIC IMPROVEMENT CORPORATION, Appellant-Respondent.— Two first separate and partial superseding final decrees of the Supreme Court, County of Queens, both entered July 11, 1973, one as to Damage Parcels Nos. 1 to 16, inclusive, and Nos. 16A, 16B, 18, 19 and 20, and the other as to Damage Parcels Nos. 22 to 34, inclusive, affirmed on the opinion of the trial court, without costs. No opinion. Gulotta, P. J., Martuscello and Brennan, JJ., concur; Shapiro, J., dissents and votes to reduce the award in the decree as to Damage Parcels Nos. 1 to 16, inclusive, and Nos. 16A, 16B, 18, 19 and 20 to $7,750,000 and to reduce the award in the decree as to Damage Parcels Nos. 22 to 34, inclusive, to $7,250,000, with the following memorandum, in which Hopkins, J., concurs: Although this proceeding was retried, as directed by the Court of Appeals (*Matter of City of New York* [*Atlantic Improvement Corp.*], 28 N Y 2d 465), many of the same errors in computing value committed upon the first trial were repeated upon the retrial. The subject property is located at the westerly end of the Rockaway peninsula. It consists of some 785 acres and is known as Breezy Point. When Breezy Point was sold to the claimant's predecessor in 1960 the land was improved with two beach clubs and approximately 3,000 small beach summer cottages which had been constructed on lots leased to the purchasers of the cottages. The vast majority of the cottages were on the central portion of the tract. By that time about 400 of the dwellings were used for year-round occupancy. The entire 785-acre tract was placed on the market in 1958. It was listed with various brokers and attempts, all unsuccessful, were made to put syndicates together to acquire the property. On February 9, 1960, Rockaway Point Development Corp. ("Rockaway Point") contracted with Urban Improvement Corp. ("Urban"), a predecessor of the claimant, to sell it the 785-acre tract for $17,500,000, all cash. Title was to close on October 1, 1960, adjournable to January 10, 1961, time to then be of the essence. Rockaway Point advised the buyer that the owners of the cottages would resist any development requiring their ouster. The purchaser nevertheless announced that it planned to create a "city within a city" by erecting high-rise apartment houses and made known its intention not to renew the tenants' 10-year ground leases. The tenants thereupon, in an effort to protect their homes and to resist any attempt to destroy their investments, united and formed the Breezy Point Co-operative ("Co-op"). On December 8, 1960, Urban assigned to Co-op the right to purchase 415 acres of the property in return for the latter's agreement to pay $11,990,750 of the $17,500,000 which Urban had contracted to pay for all 785 acres. This left Urban with two areas: a 143-acre section at the eastern end of Breezy Point (the "Twin Parks" area), and a 209-acre section at the western end (the "Tip" area). Additionally, by virtue of a restrictive covenant agreement, a right of way consisting of approximately 16 acres was reserved by Urban in order to give it access to the otherwise landlocked Tip. Urban agreed to relocate 250 bungalows in the Twin Parks area to the section owned by Co-op. The transaction with Co-op reduced Urban's purchase cost from $17,500,000 to $5,509,250 and left it with 370 acres, not including a 21-acre section not condemned. Interestingly, the claimant's efforts to obtain FHA mortgages for its proposed development of apartment houses in the 21-acre area not condemned (which lies adjacent to the Twin Parks section) were unsuccessful because the FHA determined that the erection of high-rise apartments was

economically unfeasible. The FHA, in its rejection, noted that the land was in an area far removed from transportation and employment and was constantly flooded during periods of storms, tides and hurricanes and that the cost of fill, street improvements, sewers and water would be inordinately excessive. In June, 1962 the claimant acquired title to 196 acres of land under water, or formerly under water, by State grant at a cost of $96,359, or one cent per square foot. The Court of Appeals, in reversing the previous total award of $39,775,208, pointedly noted that it was more than seven times the amount that the land, in substantially the same condition, had cost the claimant only three years prior to the condemnation. It commented that only a small portion of the claimant's extensive development plans had been set in motion and that was entirely in the 21-acre area not taken by condemnation. Although detailed plans for the Twin Parks area had been projected, no work had been started or, for that matter, even contracted for. The Court of Appeals referred to the proposals for the Tip as "a plan without detail" (*supra*, p. 470). It aptly described the Tip as "low-lying and exposed to strong tidal and wind action," requiring "extensive fill to be usable for any residential development" (*supra*, p. 470). The projected utilization of the Twin Parks area, it said, was dependent upon the acquisition from the city of land under Jamaica Bay which, if and when acquired, would require extensive fill. Under these circumstances, the Court of Appeals held that it was improper, as a matter of law, to award damages based on capitalization of estimated income, as fair market value could not be properly measured on projections of income from nonexistent structures on land which required extensive physical change to render it usable for the intended purpose. The court also noted that the proof offered of comparable sales shed no light on value. The proffered sales were considered by the court to be radically different in size, adjacent development and physical location. It stated the rule to be applied on the retrial in the following unmistakable language (*supra*, p. 472): "It should not be a matter of insuperable difficulty for claimant to establish the fair market value of the land taken in its actual physical state without recourse either to capitalization of income on unstarted projects or to comparisons of other properties essentially dependent on the same future projects. Some consideration *should be given to the sale of the large acreage of contiguous land by claimant's predecessor a few years before condemnation as well as the price paid by claimant for the land itself*" (emphasis supplied). Unfortunately, Special Term in rendering a total award of $31,000,000 ($16,300,000 for the Twin Parks area and $14,700,000 for the Tip) ignored the guidelines laid down by the Court of Appeals and, in the main, repeated the mistakes which had resulted in the original grossly excessive award. Special Term held that the best use of the property was as a Planned Unit Development (hereafter PUD) consisting of an apartment house complex with ancillary facilities. Despite the clear statement by the Court of Appeals to the contrary, it held that the sale to the Co-op was of no aid in determining value and that the sale to Urban had been for less than the full market value. These were therefore excluded from its consideration. While agreeing that the claimant's proof of other sales did not produce any which were truly comparable, the Special Term found "'a glimmering of the path to the market place'" in a sale in Bayside. It concluded that there were truly no appropriate comparable sales, that the land was vacant and unproductive, that there was no income to capitalize and that the actual purchase price and the assessed valuation did not furnish a true guide to value. It therefore made a valuation based upon what it denominated as basic equitable principles of fairness. In my considered opinion, the awards

under review are neither fair nor equitable but, on the contrary, represent an unconscionable raid upon the public purse. In the face of proof which clearly demonstrated the economic and practical unfeasibility of the erection of a PUD, Special Term's finding that a PUD was the highest and best use to which the property could be put is inexplicable. The community planned for the Twin Parks area was to contain 55 apartment houses, including dozens of high-rise buildings at a total development cost of from $150,000,000 to $200,-000,000. As noted, the FHA considered even a small part of any such proposed development to be economically unfeasible. It is not open to dispute that work in the Twin Parks area had neither been contracted for nor started at the time of condemnation, that the financing procurable was grossly inadequate and that the claimant was wholly inexperienced in the development of even small scale apartment house complexes. In such a situation, where the proposed high risk development is to take place in a remote, inaccessible area and where there is a complete absence of credible proof that the venture is economically sound, we may not, by any common-sense standard, assume its ultimate success. Indeed, every realistic sign points to its probable failure. It must be remembered that approximately seven feet of fill was required to first raise the land to grade and that 25% of all the acreage would necessarily have to be devoted to streets and nonincome-producing public facilities. The claimant itself estimated that it would take seven years to develop the Twin Parks tract alone for the proposed use. It estimated its development costs therefor at between $150,000,000 and $200,000,000. Completion of its PUD concept of creating a full-grown community on both tracts would therefore require at least twice that investment. *However, in over a decade, not a single conventionally financed high-rise apartment house had been successfully completed anywhere on the Rockaway peninsula.* Furthermore, the development plan hinged on acquiring and filling in a sizable tract of city-owned land in Jamaica Bay. The remapping of streets, rezoning, agreements with the city on public schools, police and fire protection, etc., had already encountered substantial public opposition. Legislation aimed at alienating the city's land under water had not only failed of passage in 1962, but was not even reintroduced at the 1963 legislative session. With conventional mortgage financing covering only half the amount per apartment sought from the FHA, the claimant had commenced construction of eight apartment houses on the 21-acre site, without provision for schools and without encountering the remapping, rezoning and land-acquisition problems inherent in the development of the balance of the planned community. Although it had mortgaged *all* of its land and assets to finance those buildings, it faced a shortage of $6,500,000 in the funds required for their completion at the time it abandoned construction. It is therefore clear that normal financing was not available for executing the PUD concept in this remote area and the contemplated seven-year development period for the smaller tract indicated that it would require at least 14 years before the entire PUD could be completed. The claimant made no attempt to establish that the abandoned buildings would have proven profitable, so as to afford some basis for assuming that a similar development of the entire tract might also have proven economically viable. In sum, the rule that an estimated income stream from a nonexistent improvement may not be valued by capitalization was used by the claimant to avoid putting in proof that the PUD could be profitably developed. Its expert, Mr. Powers, did not testify as to the economic viability of the project. Indeed, he indicated that he had not considered questions of cost, income or profitability. Contrariwise, the city's experts testified extensively at both trials as to the economic viability of the

PUD concept and concluded that it would have been doomed to failure. Their views, unlike that of the claimant, are amply supported by the evidence. Additionally, the awards violated the rule that a prospective use which is no more than a hypothetical hope in the mind of the claimant may not be the basis for a finding of value (see *Matter of City of New York [Shorefront High School-Rudnick]*, 25 N Y 2d 146, 149; *Triple Cities Shopping Center* v. *State of New York*, 26 A D 2d 744, affd. 22 N Y 2d 683; *Matter of City of New York [Broadway Cary Corp.]*, 40 A D 2d 865, affd. 34 N Y 2d 535). The proposed use was just a hypothetical plan. The development of the Twin Parks area required (1) the acquisition of city land, (2) the ability to properly finance a project whose history indicated the unlikelihood that proper financing could be arranged and (3) thereafter, if that were in fact accomplished, the construction and rental of 55 apartment houses in a remote area inaccessible to transportation. The Tip presents an even more outrageous picture. The plan for its development lacked detail. The amount of fill required to raise its upland to grade was 2,150,000 cubic yards. The upland had to be elevated by approximately seven feet.* Work was not to begin on this area for many years. The award for this area was thus improperly based upon a sequence of conjectures (cf. *Sparkill Realty Corp.* v. *State of New York*, 268 N. Y. 192, 197). Although Special Term properly concluded that the proof of sales of other properties revealed none which were truly comparable, it placed some reliance upon the sale of a 52-acre site in Bayside, Queens, overlooking Little Neck Bay, known as Birchwood Towers. That property was to be developed for use as an apartment house complex. It was error, as a matter of law, to consider such sale. The evidence established that Bayside was a developed community at the time of that sale. It contained apartment houses, small homes, garden apartments, shopping facilities, churches, a community college and parks. The property was located directly across the street from a vast apartment house complex and one block from another such development. The value of land in a developed residential community such as Bayside may not be attributed to raw, vacant land in a remote inaccessible area. The value imparted to the Birchwood site by the previous apartment house developments on immediately adjoining land was alone sufficient to vitiate any comparability to acreage in a remote area adjoining two bungalow colonies even were we to disregard the reality of the thriving and previously existing community in Bayside. This court was confronted with a somewhat similar situation in *Matter of City of New York [Chestnut Props. Co.]* (39 A D 2d 573). We there noted (pp. 573–574): "In our opinion it was error to predicate the award upon the value of a nonexisting income stream from land as if it were improved by buildings which had not been constructed at the time title vested (*Arlen of Nanuet* v. *State of New York*, 26 N Y 2d 346, 350). Elaborate forecasts of income from nonexisting structures on land which needed large physical change to be usable for its purposes are not a proper measure of fair market value (*Matter of City of New York [Atlantic Improve-*

---

* Compare *Giarrusso* v. *State of New York* (19 A D 2d 582), in which 7½ feet of fill were required to make 32 acres usable. The claimant's expert valued the property at the price it would bring as filled property and deducted the cost of the fill. In rejecting his testimony the court held (pp. 582-583): "It may be inferred from the proof that the accomplishment of such a massive filling job, if done by any normal method, could only take place years or decades in the future. The testimony upon this subject was sheer speculation and an unsound method of computing damage that may not be adopted".

*ment Corp.*], 28 N Y 2d 465, 470). We are in accord with the city's contention that where, as here, the planned development of land is interrupted by condemnation, the best criterion of market value is the price a purchaser would pay for the land in the state of exploitation to which it had progressed at the time of vesting of title in the condemnor. In the present proceeding the experts for the respective parties agreed that there was no direct comparable market data available to indicate the value of the subject site. In this contingency, the recent actual sale price of the subject property was the best and most substantial evidence of market value. Additionally, the claimant is entitled to be recompensed for developmental enhancement of the property in preparing it for its contemplated use." In this case, as in the *Chestnut Props.* case, there is no comparable market data available. Hence, the proper method of valuation is actual sale price plus recompense for developmental enhancement, particularly as the risks inherent in this venture are much greater than those in *Chestnut Props.* The claimant's expenditures include the $5,500,000 purchase price, $5,600,000 on the partial construction of the abandoned buildings, $3,400,000 to rebuild certain beach clubs, $640,000 in bonuses to raise capital, plus real estate taxes, architect's fees, legal fees, etc., totaling, in all, $19,300,000. It has already received $5,600,000 for its abandoned buildings and $4,000,000 for the beach clubs by virtue of the award made at the first trial. At least $1,100,000 will be paid for the land in the 21-acre remainder area, as the city has appraised the value of that land at $54,500 per acre. The claimant's compensation will therefore total at least $10,700,000, independent of the award for the land here under review. As the awards here will compensate the claimant for the land, we can arrive at a figure for developmental enhancement by deducting from the figure of $19,300,000 the amount allocated by the claimant to its purchase price for the unimproved land — $4,400,000, leaving approximately $15,000,000. We must then deduct from this figure the approximately $10,700,000 already secured (or receivable) by the claimant, which leaves a figure of $4,300,000 representing the costs of developmental enhancement. This figure should be added to the market value of the land based upon the recent actual sales price. (The length of time for which Breezy Point was on the market — *without a buyer* — prior to that sale indicates, contrary to the finding of Special Term, that the price paid was an adequate reflection of true value.) The award here made of $31,000,000, considering the amounts already paid to the claimant, would leave it with a profit (exclusive of interest) of about $22,400,000 over its total expenditures. Such a result is unconscionable and insupportable. Special Term also erred in fixing the value of land under water. It adopted the "ratio method" and fixed its value at one third of the upland value. This method was predicated upon the assumption that eight acres of land had annually accreted in the 10 years prior to condemnation and would continue to accrete at that rate in subsequent years. However, the record reveals that the annual rate of accretion had fallen below three acres after 1961, and was down to 2.2 acres after 1967. Hence, the theoretical future accretion of eight acres per year was based on sheer conjecture. I credit, in large part, the valuation of city expert Tuchler, who included in his total estimate of value all land that might accrete in the future. His appraised value included five cents per square foot for underwater land at the Tip, which was substantially above the one cent per square foot which the claimant had paid the State therefor; and from 8 to 15 cents per square foot for the underwater land in the Twin Parks area, which was twice what the claimant was to pay the city for its underwater land in Jamaica Bay. On this

record there is no justification for an award for the Twin Parks area which is in excess of $7,750,000 or for the Tip area which is in excess of $7,250,000. I would modify the decree accordingly and as so modified would affirm.